UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAWN LUCHINSKI,

        Plaintiff,

    v.                                    Case No. 15-CV-028

MICHAEL THURMER et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Shawn Luchinski, an inmate in the custody of the Wisconsin Department of Corrections (DOC) currently serving a sentence for repeated acts of sexual assault of a child, filed this pro se civil rights action under 42 U.S.C. § 1983 against numerous DOC employees challenging the confiscation of a publication containing sexually explicit material. The case is before the court on the parties' cross-motions for summary judgment. For the reasons below, the defendants' motion will be granted, the plaintiff's denied, and the case will be dismissed.

## BACKGROUND

Plaintiff was housed at Waupun Correctional Institution (WCI) at all times relevant to this case. Most of the defendants worked at WCI at the relevant time. Michael Thurmer was the warden of WCI; Michael Mesner was a deputy warden; Donald Strahota was the security director; James Muenchow was an inmate complaint examiner; Thomas Core was a captain; John Dahlke was a sergeant; Angela Kroll was a program assistant; and Dr. Gary Ankarlo was the Psychology Supervisor at WCI. The remaining defendants worked in the office of the Secretary of the DOC.

Tom Gozinski was a corrections complaint examiner and Amy Smith was Deputy Secretary. Defs.' Prop. Findings of Fact ¶¶ 1–10, 13, ECF No. 34.

On November 10, 2008, Plaintiff received a notice that a publication he had ordered called "MF Cares" would not be delivered to him. MF Cares (the MF apparently stands for Miller's Fantasies) is a now defunct magazine that was owned by Colleen Miller of Pittsburgh, Pennsylvania. Decl. of Tracy Foster ¶ 7, ECF No. 38. It claimed to be directed toward "connoisseurs of beautiful women." Decl. of James Muenchow ¶ 13, ECF No. 39. The notice of non-delivery Plaintiff received described the publication as a "commercial photo catalog" and stated that the reason for non-delivery was that the publication contained "contraband." Notice of Non-Delivery of Mail/Publication, Ex. 1003, ECF No. 37-4. "Contraband" is any material the inmate is not allowed to possess. DOC 309.02(5) & DOC 303.02(8)(a).

The DOC's ban on commercial photographs was adopted in 2006 in an effort to reduce the labor needed to process the amount of mail received at the State's correctional facilities. As explained by the Seventh Circuit in a decision upholding the policy against constitutional challenge, the blanket prohibition against such photographs was adopted because DOC staff were spending too much time reviewing individual photographs for nudity and other forbidden content such as gang symbols, and then, if disallowed, contacting the inmates to determine how to dispose of them. *Jackson v. Frank*, 509 F.3d 389, 390–91 (7th Cir. 2007). To ease the burden on the DOC's resources, the rule prohibits individual, commercially published photos altogether. At the same time, the policy permits photos of inmates' family and friends, which are less likely to contain impermissible material, and it allows inmates to subscribe to magazines that contain commercial

2

photographs, which are easier to screen than individual commercially published photos (i.e. an issue of a reputable magazine can be screened without the need to review each of the photos in it). *Id.*

Plaintiff filed an inmate complaint challenging the decision denying him his copy of MF Cares, arguing the publication was a magazine and could not be denied solely because it had commercial photos in it. Inmate Complaint Examiner (ICE) James Muenchow investigated Plaintiff's complaint and concluded that whether the publication was subject to the prohibition on commercially published photographs was irrelevant because his investigation showed the publication was "injurious" within the meaning of DOC regulations. As relevant in this case, a publication is "injurious" and therefore banned if it is "pornography" or if it is "inconsistent with or poses a threat to the safety, treatment or rehabilitative goals of an inmate." DOC 309.04(4)(c)8.a., c. "Pornography" is defined in part as non-written material that depicts "human sexual behavior" including actual or simulated acts of sexual intercourse, oral sex, or masturbation. DOC 309.02(16)(a)1. & (9)(a). Pornography is also defined as "a publication that features nudity," where "features" means "the publication contains depictions of nudity on a routine or regular basis or promotes itself based upon depictions of nudity in the case of individual one-time issues," and "nudity" means "the showing of human male or female genitals or pubic area with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of the areola or nipple, or the depiction of covered male genitals in a discernibly turgid state." DOC 309.02(16)(b), (7m) & (14). The regulations do not prohibit a publication solely because it contains nudity that has a medical, educational or anthropological purpose. DOC 309.02(7m).

ICE Muenchow concluded that the publication was pornography, as it "clearly contains several instances each of nudity by definition in DOC 309.02(14) with no clear medical, educational,

3

or anthropological purpose." ICE Muenchow also reported that he contacted Dr. Ankarlo, the Psychology Supervisor, who reviewed the publication and advised him that "due to inmate Luchinski's offense dynamics, the publication is injurious as it is inconsistent with or poses a threat to Luchinski's safety, treatment or rehabilitative goals." Ex. 1008 at 008, ECF No. 39-1. Muenchow therefore recommended dismissal of Plaintiff's complaint on December 12, 2008. Warden Thurmer accepted Muenchow's recommendation on December 15, 2008, and the dismissal was affirmed by the Office of the DOC Secretary on January 21, 2009.

After Plaintiff failed to provide prison officials with an approved method for disposing of the publication, the confiscated publication was destroyed on July 20, 2009. The defendants later tried to obtain a copy of the issue of MF Cares for the court to review after Plaintiff filed this lawsuit, but they were unsuccessful. Dec. of Tracy Foster, ECF No. 38. ICE Muenchow has averred, however, that issues of MF Cares generally consist of about 10 pages with 30–40 photographs on each page. Also, at the time he reviewed Plaintiff's inmate complaint, Muenchow scanned excerpts from two pages of the confiscated issue to serve as an example of content found throughout the publication. The scanned photographs, which have been included in the record, show a woman scantily dressed with see-through, lingerie-type clothes, with genitals and nipples visible through the clothes of many of the photos. Many photos show the woman spreading her legs to display her genital area, which is covered only by see-through underwear. Several show the woman visibly touching her genitals, or pulling the underwear against the genitals to expose more of the public mound area. Dec. of James Muenchow ¶¶ 12–13, ECF No. 39 & Ex. 1008 at 017–018.

As noted above, Dr. Ankarlo recommended Plaintiff not have access to this publication because it was "injurious" as inconsistent with Plaintiff's safety, treatment, or rehabilitative goals.

4

Dr. Ankarlo's decision was based on Plaintiff's offense dynamics and Ankarlo's training and experience as a licenced psychologist. Dec. of Dr. Gary Ankarlo ¶¶ 15–16, ECF No. 36. Plaintiff, who was 33 years old at the time, was serving a combined 80-year prison sentence for convictions in 2004 of three counts of repeated sexual assault of the same child. Although he had an identified need for sex offender treatment, he had not yet received treatment. *Id.* ¶¶ 11–14 & Ex. 1007. Dr. Ankarlo's experience at the time included more than six years on the job as WCI's Psychology Supervisor, where his responsibilities included overall administration of the Psychological Services Unit, providing psychological services to inmates and making recommendations for institutional programming. Dr. Ankarlo is now the Psychology Director of the DOC's Division of Adult Institutions, and he has received training on the assessment and treatment of sex offenders and completed more than 100 sex offender treatment evaluations. Ankarlo Dec. ¶¶ 2, 5. In short, Dr. Ankarlo states that "[b]ecause Luchinski was a convicted sex offender who had not yet undergone any sex offender treatment, [Ankarlo] believed that the issue of 'MF Cares' could promote sexual deviance given [its] graphic content." *Id.* ¶ 16.

On January 9, 2015, shortly before Wisconsin's six-year statute of limitations on § 1983 claims would have expired (assuming it had not already expired, at least for the non-delivery), and more than five years after the publication was destroyed, Plaintiff filed this action claiming its confiscation violated his civil rights. The complaint included vague references to the Fourteenth Amendment, retaliation, "release of confidential records," deliberate indifference, discrimination and the Eighth Amendment. The court screened the complaint under 28 U.S.C. § 1915A and, noting that the publication at issue was not part of the record, permitted Plaintiff to proceed on the claim that the confiscation violated his rights under the First Amendment as incorporated against the States by

5

the Fourteenth Amendment. The other causes of action suggested in the complaint were dismissed as the complaint contained no allegations supporting them.

The defendants have filed a motion for summary judgment on the First Amendment claim, arguing (1) the publication was properly confiscated and the confiscation did not violate Luchinski's First Amendment rights; (2) the defendants are not personally responsible for the denial of the publication as they were following Wisconsin law; and (3) the defendants are entitled to qualified immunity to the extent that any constitutional violation occurred. Luchinski has not responded to the defendants proposed findings of fact, which are therefore deemed uncontroverted, Civil L. R. 56(b)(4), but he has requested that summary judgment be entered in his favor. He has also filed a brief in opposition to the defendants' motion for summary judgment, and he has filed a declaration completed by fellow WCI inmate Daniel Anthony Peace. Inmate Peace states that he is serving a sentence for numerous sexual assault convictions, but that he has nonetheless possessed sexually explicit magazines since his incarceration. Copies of two such magazines, entitled "Originators" and "Straight Stuntin," are attached to Peace's declaration. Exs. 9 & 11.

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In analyzing whether a question of fact exists, the court will construe the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Disputes about facts not material to a determinative

6

issue do not preclude summary judgment. *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir. 1988).

**ANALYSIS**

The Supreme Court has held that "imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (citing *Turner v. Safley*, 482 U.S. 78, 93 (1987)). A prison regulation that restricts an inmate's First Amendment rights is permissible if it is "reasonably related to legitimate penological objectives." *Turner*, 482 U.S. at 89. In determining whether a prison regulation violates inmates' constitutional rights, several factors are to be considered. First, there must be "a valid, rational connection between the regulation and the legitimate government interest put forward to justify it." *Id.* "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89–90. A second factor that is considered is "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. The third factor to consider is the impact that accommodating the right will have on guards and other inmates, and the allocation of prison resources generally. *Id.* Finally, courts should also consider the absence of alternatives to the prison regulation. *Id.*; *Jackson*, 509 F.3d at 391.

The Supreme Court has also cautioned that courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Moreover, in deciding whether

7

a regulation is constitutional, it is important to "distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard*, 548 U.S. at 530. As to the latter, any inferences drawn by the court "must accord deference to the views of prison authorities. . . . Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.*

In this case, the defendants have offered legitimate governmental interests to justify the regulation under which the challenged action was taken. Specifically, they contend that the DOC's ban on pornography promotes the crucial governmental interests in the safety and security of inmates and guards, and the rehabilitation of the inmates. Defs.' Proposed Findings of Fact (DPFOF) ¶ 25, ECF No. 35. The primary support for their contention is found in the Declaration of Thomas Core, a supervisor captain at WCI with thirty-five years of experience at DOC. Captain Core states that allowing inmates to possess pornographic materials "would promote disrespect for male and female correctional staff, and erode the authority of all staff members by encouraging inmates to harbor inappropriate thoughts and to make inappropriate comments and gestures, especially to female correctional staff." Decl. of Thomas Core ¶ 22, ECF No. 37. Captain Core also notes that crimes can and do occur in correctional institutions "including offenses against bodily security such as battery, sexual assault and sexual conduct, threats and fighting." *Id.* ¶ 26. Because it can be difficult in a prison environment to prove lack of consent among inmates, Captain Core states that all sexual activity between inmates is prohibited. *Id.* The possession of pornography, Captain Core states, "increases the threat of inmates engaging in deviant sexual behavior, including consensual and non-consensual sexual intercourse." *Id.* ¶ 27. Core also notes that inmate access to pornography can "promote a sexual preoccupation instead of engaging in functional pro-social activities." *Id.*

8

He opines that ready access to pornography is particularly harmful to sex offenders since it is likely to feed the deviant behavior and immoderate preoccupation that contributed to an inmate's incarceration in the first place. *Id.* at ¶ 31. *See generally* DPFOF ¶¶ 25–45.

Essentially, these are the same interests that have been found sufficient to justify the federal ban on pornography in other cases challenging pornography bans in state and federal prisons. In *Ramirez v. Pugh*, for example, a federal prisoner at a low-security correctional institution in Allenwood, Pennsylvania challenged the constitutionality of the Ensign Amendment which banned the use of federal funds to distribute sexually explicit material to prisoners. 486 F. Supp. 2d 421 (M.D. Pa. 2007). The district court initially granted the government's motion to dismiss, concluding that the ban passed constitutional muster because it was rationally related to the government's interest in prisoner rehabilitation and security. The Third Circuit found that the factual record was insufficient to support the district court's conclusion, however, and reversed. *Ramirez v. Pugh*, 379 F.3d 122 (3d Cir. 2004). In so ruling, the court noted that the prohibition was "clearly connected to the rehabilitation of sex offenders whose demonstrated inability to control their sexual impulses had led to their incarceration at the facility in question." *Id.* at 129. In view of the relatively low number of sex offenders in federal prison, however, the court concluded that more was required to establish the reasonableness of the regulation for the entire prison. *Id.*

On remand, the government supplemented the record with a report of Dr. Andres E. Hernandez, a declaration from psychologist Dr. Joyce K. Conley, and a declaration from Kendahl Gainer, a case manager from the Allenwood facility, and the district court reached the same conclusion on summary judgment. 486 F. Supp. 2d at 428. In his expert report Dr. Hernandez, the Director of the Sex Offender Treatment Program and Hypersexuality Management Program at

Federal Correctional Institution Butner, explained that "exposure to pornographic materials has a deleterious effect on the rehabilitation of sex offenders." *Id.* The district court did not recount the reasons for Dr. Hernandez's opinion presumably because the Third Circuit had already concluded that common sense was a sufficient basis for that conclusion. *Id.* at 429 (citing *Ramirez*, 379 F.3d at 129). Instead, the court turned to Dr. Hernandez's opinion that banning pornography to the general inmate population was essential if sex offenders were to be prevented from getting hold of it. The reason why a general ban was necessary, Dr. Hernandez opined, was to prevent the material from circulating within the inmate population since inmates would likely share, distribute, and sell pornography to those most desirous of it. *Id.* at 429; *see also Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989) ("[M]aterial of this kind reasonably may be expected to circulate among prisoners.").

Dr. Hernandez also concluded that a ban on pornography promoted the rehabilitation of the general prison population, even those not convicted of sex offenses. He noted that "prisoners bring a 'cultural milieu' to prison that is criminogenic, sexist and misogynist." *Id.* at 429. According to studies he reviewed and based on his own clinical experience, Dr. Hernandez noted that "exposure to both non-violent and violent pornography affects both aggressive attitudes and behaviors. These studies concluded that pornography enhances negative attitudes toward women and increases acceptance of rape myths; lower inhibitions to aggress against women; and produces subsequent violent sexual fantasies in the consumer of pornography." *Id.* at 430. Dr. Hernandez further noted that "prisoners generally—sex offenders and non-sex offenders alike—view human beings as mere objects for personal advancement and satisfaction. Exposure to pornography furthers this view, by perpetuat[ing] the belief that women are sexual objects for the use and sexual gratification of men." *Id.* (internal quotations omitted). Restricting prisoners' access to pornography, Dr. Hernandez

10

concluded, "assists prison administrators in shaping inmates' fundamentally criminogenic culture and replacing it with prosocial attitudes, values and behaviors." *Id.* at 430–31. Dr. Conley concurred with Dr. Hernandez's findings and conclusions. *Id.* at 431.

On the issue of institutional security, Dr. Hernandez stated that after viewing pornography, "criminals were more likely than non-criminals to perform a sexual act such as masturbation, consensual or criminal sex." *Id.* at 433. He noted that approximately 5,000 inmates may have incident reports citing them for improper sexually acting out, which is highly disruptive to the correctional environment, and that 89% were not sex offenders. Dr. Hernandez also offered the opinion that "pornography increases an inmate's urge to engage in sexual violence towards fellow inmates as well as prison staff, primarily female," an opinion also shared by Dr. Conley. *Id.* Both concluded that restricting access to pornography therefore served the penological interest in institutional security. Notwithstanding the fact that other experts disagreed with these opinions, the district court had no difficulty concluding that the prison ban was reasonably related to the government's interest in both rehabilitation and institutional security. *Id.* at 435.

Other courts have reached similar conclusions. In what may be the seminal case on the issue, the D.C. Circuit rejected a claim by inmates that the United States Bureau of Prisons was violating their First Amendment rights by denying them their subscriptions to *Penthouse* and *Playboy* magazines, concluding that the BOP's ban on pornographic magazines was rationally related to the legitimate penological interest in rehabilitation:

> We think that the government could rationally have seen a connection between pornography and rehabilitative values. Congress might well perceive pornography as tending generally to thwart the character growth of its consumers. One current exposition of this view sees pornography as treating women purely as objects of male sexual gratification. *See, e.g.*, Catharine A. MacKinnon, *Only Words* 108–10;

11

> MacKinnon, "Francis Biddle's Sister: Pornography, Civil Rights, and Speech," in *Feminism Unmodified* 163, 174 (1987); Martha C. Nussbaum, "Objectification," 25 *Phil. & Pub. Affairs* 249, 283–86 (1995); Cass Sunstein, *The Partial Constitution* 257–90 (1993). But this viewpoint shares at least a core with ideas that have a lineage of a few centuries, perhaps millennia, stressing the desirability of deferring gratification, of sublimation of sexual impulses, of channeling sexual expression into long-term relationships of caring and affection, of joining eros to agape. The supposition that exclusion of pornography from prisons will have much of an impact in this direction may be optimistic, but it is not irrational.

*Amatel v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998). A majority of the Ninth Circuit likewise found a county jail's ban on material containing full frontal nudity was reasonably related to the county's interests in "maintaining jail security, rehabilitating inmates and reducing sexual harassment of female detention officers." *Mauro v. Arpaio*, 188 F.3d 1054, 1059–60 (9th Cir. 1999) (en banc); *see also Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999) (holding that constitutional challenge to state regulations restricting access of sex offender inmates to pornography lacks merit).

More recently, however, the Seventh Circuit has suggested that the judgments of prison officials are "not ironclad" and expressed a desire to see such bans analyzed "scientifically." *Payton v. Cannon*, --- F.3d ----, 2015 WL 7729382, *2 (7th Cir. Dec. 1, 2015). The Court noted that "[t]here is extensive academic literature bearing on the issue, some of which challenges the intuitions of prison wardens and staff." *Id.* And in *Brown v. Phillips*, the Seventh Circuit reversed a district court's summary judgment rejecting a First Amendment challenge to a ban on movies and video games "with sexual and/or graphic violent themes deemed especially counter-therapeutic" by civilly committed Illinois sex offenders "[b]ecause the record does not contain a sufficient basis to conclude that the ban on movies and video games is reasonably related to the state's interests in security and rehabilitation." 801 F.3d 849, 851, 852 (7th Cir. 2015).

12

*Brown* and *Payton* could arguably be read as requiring empirical evidence that a ban on pornography furthers rehabilitation or improves security for it to pass constitutional muster. *Brown*, 801 F.3d at 854 (stating "some data is needed to connect the goal of reducing the recidivism of sex offenders with a ban on their possessing legal adult pornography" (citing *United States v. Taylor*, 796 F.3d 788, 792–93 (7th Cir. 2015))); *Payton*, 2015 WL 7729382 at * 1 ("Great latitude is not the same as unreviewable discretion, however, and the ex-warden's statement is the only evidence submitted by the defendants concerning harm to the prison from materials that the defendants want to forbid to the prisoners. But the plaintiff produced no evidence contrary to the warden's. Nor did he point out that the warden's statement appears to be based on impression rather than on data.").

What that evidence or data would consist of, however, is itself unclear. As the Seventh Circuit has also noted in connection with its review of conditions of supervised release imposed in criminal cases at sentencing, there are limitations to the social science studies on the causes and cures of recidivism:

> There is the difficulty of determining the number of crimes committed by a person after his release from prison—the number that is the real measure of recidivism—as distinct from the number of his arrests or convictions, which may be much smaller. And statistical studies are unlikely to enable a confident prediction that a particular inmate will or will not commit crimes after he is released.

*United States v. Siegel*, 753 F.3d 705, 709 (7th Cir.2014). Aside from these difficulties, there is the inherent problem of trying to determine cause and effect in assessing freely willed human behavior. It is perhaps because of these difficulties that academic studies fall on both sides of the issue with some purporting to document and others purporting to destroy the causal link between pornography and sex crimes. *Id.* at 709. Expert opinions of psychologists likewise fall on both sides of the

13

question. *Waterman*, 183 F.3d at 215–16; *Ramirez*, 486 F. Supp. 2d at 428–34. But that does not

mean that the prison's policy is unreasonable.

In *Amatel*, for example, the D.C. Circuit acknowledged that there was "no 'record evidence,'

and certainly no sophisticated multiple regression analyses or other social science data, to support

this belief [that pornography undermines rehabilitation]." 156 F.3d at 199. But the Court did not

conclude from this that the ban on pornography in prisons was unreasonable. "Common sense," the

Court noted, "tells us that prisoners are more likely to develop the now-missing self-control and

respect for others if prevented from poring over pictures that are themselves degrading and

disrespectful." *Id.* In the absence of clear scientific proof to the contrary, the Court held, common

sense was sufficient:

> We do not think, however, that common sense must be the mere handmaiden of
> social science data or expert testimonials in evaluating congressional judgments.
> Quite the opposite: scientific studies can have a corrective effect by establishing an
> apparently implausible connection or refuting an apparently obvious one, but, subject
> to such corrections, conformity to commonsensical intuitive judgments is a standard
> element of both reasonableness and rationality.

*Id.*

*Turner v. Safley* requires no more. As *Turner* makes clear, it is not the role of the federal

courts to decide how state prisons are to be run:

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny
> analysis would seriously hamper their ability to anticipate security problems and to
> adopt innovative solutions to the intractable problems of prison administration. The
> rule would also distort the decisionmaking process, for every administrative judgment
> would be subject to the possibility that some court somewhere would conclude that
> it had a less restrictive way of solving the problem at hand. Courts inevitably would
> become the primary arbiters of what constitutes the best solution to every
> administrative problem, thereby unnecessarily perpetuating the involvement of the
> federal courts in affairs of prison administration.

14

482 U.S. at 89.

The question a court confronted with this issue must decide is not whether the State's ban on pornography within its prisons is the best policy; the question is whether it is reasonably related to legitimate penological interests. *Waterman*, 183 F.3d at 216–17 ("The District Court applied the wrong standard, replacing the New Jersey legislature's policy decisions with its own 'more reasonable' judgment. In so doing, the Court failed to accord the legislature's judgment the deference to which it is entitled. The appropriate question is not whether the theories advanced by either party's experts are 'more reasonable' and 'more convincing,' but instead whether 'the logical connection between the [statute] and the asserted goal' of improving the A.D.T.C.'s sex offender rehabilitation program is 'so remote as to render the policy arbitrary or irrational.'") (quoting *Turner*, 482 U.S. at 89–90). And where, as in this case, there exists a sharp dispute between the contending theories within the relevant professions, one is hard-pressed to say the State's adoption of one theory over the other is unreasonable. *Amatel*, 156 F.3d at 200–01 ("The evidence is simply not conclusive on the efficacy of a ban on pornography in promoting prisoners' rehabilitation. For judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative."). It should be enough to note that a ban on pornography within the prison does not constitute cruel and unusual punishment, *Overton*, 539 U.S. at 139 (Thomas, J., concurring), and is reasonably related to legitimate penological purposes, *Turner*, 482 U.S. at 822. No inmate could seriously contend he was harmed by a ban on pornography or denied life's basic necessities.

Even aside from the general question of whether the ban on pornography within the prison makes sense for the prison population as a whole, however, the defendants here also offered specific evidence that prohibiting Plaintiff from receiving the actual pornographic materials at issue was

15

reasonably related to his own rehabilitation. Dr. Ankarlo specifically reviewed the issue of MF Cares

that Plaintiff ordered and determined it would be inappropriate for him given his offense dynamics,

including that Plaintiff had committed numerous sex crimes against children and that he had not yet

completed any sex offender treatment program. Dr. Ankarlo, who had training and experience in

the assessment and treatment of sex offenders and was responsible for development, administration

and coordination of psychological programs within the unit, opined that the issue of MF Cares that

was confiscated could promote sexual deviance given it's graphic content. He also noted that his

actions in approving the confiscation of the material were in accordance to DOC policy and

procedure and applicable standards in order to ensure the safety and well-being of Plaintiff, other

inmates, staff, and the overall security of the institution. Ankarlo Decl. ¶¶ 3, 4.

Although Plaintiff has filed a motion in limine seeking to bar the defendants' use of Dr.

Ankarlo's declaration on the ground that Ankarlo is a named defendant, ECF No. 46, the motion is

without merit. Dr. Ankarlo is a fact witness in this case—his declaration provides information

regarding the determination he made during the investigation of Plaintiff's initial inmate complaint.

Moreover, to the extent the issues Ankarlo discusses require an expert opinion, Dr. Ankarlo is

clearly qualified as an expert in the relevant area and his opinion would be admissible under Federal

Rule of Evidence 702. *See also Braun v. Lorillard Inc.*, 84 F.3d 230, 238 (7th Cir. 1996) (party not

disqualified from providing expert opinion); *Tagatz v. Marquette*, 861 F.2d 1040, 1042 (7th Cir.

1988) (same).

Based on Dr. Ankarlo's declaration, as well as that of Captain Core, I conclude that the

defendants have established that the decision not to deliver the issue of MF Cares to Plaintiff was

reasonably related to legitimate penological interests in his own rehabilitation and institutional

16

security as a whole and thus did not violate his rights under the First Amendment. The only evidence Plaintiff has put forth in opposition to the defendants' motion is the declaration of another inmate, also a sex offender, who states that he has been allowed to possess similar sexually explicit material. Decl. of Daniel Anthony Peace, ECF No. 44. But the magazines Peace received are not as explicit as Plaintiff's. Peace's magazines, although coming close, do not appear to "feature nudity" as defined by the pornography regulation. Plaintiff does not dispute that the MF Cares issue he was denied met the DOC's definition of pornography. Even assuming for the sake of Plaintiff's argument that Peace's materials meet the DOC's definition of "injurious materials," that determination would not raise a genuine issue of fact as to whether confiscating Plaintiff's magazine was reasonably related to Plaintiff's rehabilitation. Perfect consistency in the application of discretionary rules is neither possible nor constitutionally required. *See Munson v. Gaetz*, 673 F.3d 630, 636 (7th Cir. 2012) (rejecting argument that other inmates were allowed to possess books similar to what was confiscated); *Thornburgh*, 490 U.S. at 417 n.15 (recognizing that a discretionary rule will result in "seeming 'inconsistencies'").

The remaining *Turner* factors also favor the defendants. Plaintiff has many alternative ways of exercising his First Amendment rights in that a large range of publications remain available to him, as well as other forms of expression. Moreover, the impact of allowing Plaintiff to have pornographic magazines could significantly change the atmosphere of the prison. If possession of pornography is held to be a protected constitutional right of prison inmates, it is likely to become ubiquitous in the male prison setting. In *Turner* the Supreme Court cautioned that when "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections

17

officials." 482 U.S. at 90. This "ripple effect" is present when the right in question is the right to receive publications from outside the prison. *Thornburgh*, 490 U.S. at 418. This is because of the high probability that the material will circulate within the prison. *Id.* Because a holding that prison inmates have a constitutional right to receive pornography would prevent the kind of experimentation that would allow prison administrators to make informed decisions after observing the results of different rules operating in different prisons, courts should be especially reluctant to substitute their judgment for that of prison administrators on such an unsettled issue. This is precisely why the Supreme Court has instructed lower courts to "accord deference to the views of prison authorities" in "disputed matters of professional judgment." *Beard*, 548 U.S. at 530. Finally, if, as the court has concluded, denying Plaintiff pornographic publications is reasonably related to his rehabilitation and the overall security of the institution, no other alternatives for the prison officials existed at the time they decided to deny deliver of the magazine to Plaintiff.

In sum, the refusal of prison officials to deliver the issue of MF Cares to Plaintiff did not violate his constitutional rights. The material was contraband under the prison regulations and its prohibition was reasonably related to the prison's interests in rehabilitation of offenders and institutional security. When Plaintiff failed to provide prison officials with an approved method for disposing of the publication, they destroyed it consistent with the warning Plaintiff was given. The destruction of his magazine likewise violated no right guaranteed by the United States Constitution.

**CONCLUSION**

For all of these reasons, Plaintiff's request for summary judgment is denied, and the defendants' motion for summary judgment is granted. For the reasons above and for reasons stated

18

in prior orders, Plaintiff's motion in limine and motion to appoint counsel (ECF No. 46) are also denied. The Clerk is directed to enter judgment dismissing the case with prejudice.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

**SO ORDERED** at Green Bay, Wisconsin this   16th   day of December, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
Eastern District of Wisconsin

19